UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:17-cv-61053-UU

MEDIBIO USA, LLC,

      Plaintiff,

vs.

FACET TECHNOLOGIES LLC,

KEVIN SEIFERT, *et al.*,

      Defendants,

vs.

GLENN PARKER,

      Third-Party Defendant. _____/

**FACET TECHNOLOGIES, LLC'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY CLAIMS AGAINST GLENN PARKER**

      Defendant Facet Technologies, LLC ("Facet") submits this Answer, including its

affirmative defenses, counterclaims, and third-party claims, in response to Plaintiff MediBio

USA, LLC's ("Plaintiff" or "MediBio") First Amended Complaint ("Amended Complaint").

**ANSWER**

**I.      PARTIES**

      1.      Facet lacks sufficient knowledge or information to admit or deny the allegations

in paragraph 1.

      2.      Facet lacks sufficient knowledge or information to admit or deny the allegations

in paragraph 2.

3.      Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 3.

4.      Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 4.

5.      Facet admits the allegations in paragraph 5.

6.      Facet denies all allegations in paragraph 6.

7.      Facet denies all allegations in paragraph 7, except Facet admits that William D. Forrest is a Connecticut citizen domiciled in Connecticut.

8.      Facet admits the allegations in paragraph 8.

9.      Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 9.

## II.      JURISDICTION AND VENUE

10.     The allegations in paragraph 10 are legal conclusions requiring no response from Facet.

11.     The allegations in paragraph 11 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies the allegations in paragraph 11.

12.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 12.

13.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 13.

14.     Plaintiff was the party that first expressed a desire to work with Facet, and to the extent that Paragraph 14 alleges otherwise, Facet denies such allegations.  Facet admits that a Facet representative traveled to Ft.  Lauderdale, Florida to negotiate contracts with Plaintiff.

15.     Facet admits that Kevin Seifert, on behalf of Facet, flew down to Florida in early 2013 to meet with MediBio and negotiate what then became the "master Alliance Agreement." Facet lacks sufficient knowledge or information to admit or deny the remaining allegations in paragraph 15.

16.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 16.

17.     Facet denies all allegations in paragraph 17, except Facet admits that it entered into the "Project Agreement No. 1 (Pen Needles)" with Plaintiff and Tae Chang Industrial Co. Ltd ("Tae Chang") on June 21, 2013.

18.     Facet denies all allegations in paragraph 18, except Facet admits meeting with Plaintiff in Florida in July 2015 and July 2016.

19.     Facet denies all allegations in paragraph 19.

20.     The allegations in paragraph 20 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies the allegations in paragraph 20.

21.     The allegations in the first sentence of paragraph 21 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies the allegations in paragraph 21.  Facet lacks sufficient knowledge or information to admit or deny the allegations in the second sentence of paragraph 21.

### III.     FACTUAL ALLEGATIONS

22.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 22.

23.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 23.

24.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 24.

25.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 25.

26.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 26.

27.     Plaintiff was the party that first expressed a desire to work with Facet, and to the extent that Paragraph 27 alleges otherwise, Facet denies such allegations.  Facet admits the remaining allegations in paragraph 27.

28.     Facet denies all allegations in paragraph 28.

29.     Facet denies all allegations in paragraph 29, except Facet admits that it entered into the "Non-Circumvention Agreement" with Plaintiff on April 4, 2013.

30.     Facet admits that Plaintiff has quoted the Non-Circumvention Agreement accurately in paragraph 30, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

31.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 31.

32.     Facet admits that Plaintiff has quoted a portion of one sentence of the Non-Circumvention Agreement accurately in paragraph 32, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

33.     Facet denies all allegations in paragraph 33, except Facet admits that Kevin Seifert is Facet's Non-Executive Chairman and was formerly Facet's President and CEO.  Facet

4

further admits that David Conn was formerly Facet's President and CEO, and Don Jackson was Facet's CFO.

34.     Facet denies all allegations in paragraph 34, except Facet admits that Plaintiff has quoted a portion of one sentence of a purported Joinder to the Non-Circumvention Agreement accurately.  Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

35.     Facet admits the allegations in paragraph 35.

36.     Facet admits that Plaintiff has quoted a portion of the Master Alliance Agreement accurately in paragraph 36, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

37.     Facet denies all allegations in paragraph 37, except Facet admits that Plaintiff has quoted a portion of one sentence of the Master Alliance Agreement accurately, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

38.     Facet admits that Plaintiff has quoted a portion of several sentences of the Master Alliance Agreement accurately in paragraph 38, but Facet objects to the fact that Plaintiff's quotes are incomplete and taken out of context, as the contract should be construed in its entirety.

39.     Facet denies all allegations in paragraph 39, except Facet admits that Plaintiff has quoted a portion of one sentence of the Master Alliance Agreement accurately, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

40.     Facet denies all allegations in paragraph 40, and Plaintiff incorrectly quotes Section 3.04(b) of the Master Alliance Agreement.  Further, Facet objects to the fact that

Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

41.     Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 41.

42.     Facets admits the allegations in paragraph 42.

43.     Facet admits the allegations in paragraph 43.

44.     Facet denies the allegations in paragraph 44.  This description, taken out of context, does not accurately state Facet's obligations.

45.     Facet denies all allegations in paragraph 45, and Plaintiff incorrectly quotes Section 1.06(g) of Project Agreement No. 1.  Further, Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

46.     Facet denies all allegations in paragraph 46.

47.     Facet denies all allegations in paragraph 47.

48.     Facet denies all allegations in paragraph 48.

49.     Facet denies all allegations in paragraph 49, except Facet admits that it purchased Lancet Automation Machines from Tae Chang or Kovac-Med.  Facet denies that any notice, permission, or other inclusion of Plaintiff was required.

50.     Facet denies all allegations in paragraph 50.

51.     Facet denies the allegations in the first sentence of paragraph 51, except Facet admits that it uses Lancet Automation Machines to produce lancets and it produces lancets of high quality.  Facet lacks sufficient knowledge or information to admit or deny the allegations in the second sentence of paragraph 51, except Facet denies that one needs to purchase cannula, but admits it uses cannula to produce lancets.

52.     Facet denies all allegations in paragraph 52, except Facet admits that it has purchased cannula from Tae Change and/or Kovac-Med.  Facet further admits that it is using the Lancet Automation Machines it purchased from Tae Chang or Kovace-Med to produce lancets.

53.     Facet lacks sufficient knowledge or information to admit or deny the allegations in the first sentence of paragraph 53.  Facet denies all other allegations in paragraph 53, except Facet admits that it has not provided Plaintiff with audited numbers showing the volume its sales of cannula because it is not obligated to do so.

54.     Facet denies all allegations in paragraph 54.

55.     Facet denies all allegations in paragraph 55.

56.     Facet denies all allegations in paragraph 56, except Facet admits that Seifert suggested to MediBio that it would be a possibility for the companies to do business with Johnson & Johnson related to Calibra syringes.  Facet further admits that Mr. Hanjin In participated in an initial telephone call with Johnson & Johnson and Facet, and Facet continued to communicate with MediBio regarding Calibra syringes.

57.     Facet denies all allegations in paragraph 57, except Facet admits that, with MediBio's knowledge, Tae Chang started to design and test and make prototypes for Calibra syringes, Johnson & Johnson paid for the building, design, and installation of assembly machinery for the Calibra syringes at Tae Chang's facility, and Facet has purchased a small number of Calibra syringes, for testing purposes only.  Facet further admits that Johnson & Johnson has indicated that it may never launch the Calibra syringe product.

58.     Facet denies all allegations in paragraph 58.

**COUNT I:**
**BREACH OF NON-CIRCUMVENTION AGREEMENT**
**(Against Facet and Seifert)**

59.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 59.

60.     Facet admits that Plaintiff has quoted the Non-Circumvention Agreement accurately in paragraph 60, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

61.     Facet denies all allegations in paragraph 61.

62.     Facet denies all allegations in paragraph 62.

63.     Facet denies all allegations in paragraph 63.

64.     Facet denies all allegations in paragraph 64.

65.     Facet denies all allegations in the first sentence of paragraph 65.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

**COUNT II:**
**BREACH OF MASTER ALLIANCE AGREEMENT AND**
**PROJECT AGREEMENT**
**(Against Facet)**

66.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 66.

67.     Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 67, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

68.     The allegations in paragraph 68 are legal conclusions requiring no response from Facet.  To the extent that a response is required, Facet denies the allegations in paragraph 68.

69.     Facet denies all allegations in paragraph 69.

70.     Facet denies all allegations in paragraph 70.

71.     Facet denies all allegations in the first sentence of paragraph 71.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

### COUNT III:
### BREACH OF AGREEMENTS-INJUNCTIONS
**(Against Facet)**

72.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 72.

73.     Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 73, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

74.     Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 74, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

75.     Facet admits that Plaintiff has quoted the Non-Circumvention Agreement accurately in paragraph 75, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

76.     Facet denies all allegations in paragraph 76.

77.     Facet denies all allegations in paragraph 77.

78.     The allegations in paragraph 78 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies the allegations in paragraph 78.

79.     Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 79, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

80.     Facet denies all allegations in paragraph 80.

81.     Facet denies all allegations in paragraph 81.

82.     Facet denies all allegations in the first sentence of paragraph 82.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

### COUNT IV:
### <u>ACCOUNTING/INSPECTION OF BOOKS & RECORDS</u>
### (Against Facet)

83.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 83.

84.     Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 84, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety

85.     Facet denies all allegations in paragraph 85.

86.     Facet denies all allegations in paragraph 86.

87.     Facet lacks sufficient knowledge or information to admit or deny the allegations in the first and second sentences of paragraph 87.  Facet denies all remaining allegations in paragraph 87.

88.     Facet denies all allegations in the first sentence of paragraph 88, except Facet admits that Facet provided information to Plaintiff in response to Plaintiff's request.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

**COUNT V:**
**BREACH OF MASTER ALLIANCE AGREEMENT –**
**EXCLUSION FROM MEETINGS**
**(Against Facet)**

89.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 89.

90.     The allegations in paragraph 90 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies all allegations in paragraph 90.

91.     Facet denies all allegations in paragraph 91.

92.     Facet denies all allegations in paragraph 92.

93.     Facet denies all allegations in the first sentence of paragraph 93.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

**COUNT VI:**
**BREACH OF PROJECT AGREEMENT QUOTAS**
**(Against Facet)**

94.     Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 94.

95.     The allegations in paragraph 95 are legal conclusions requiring no response from Facet.  Facet denies the construction.

11

96.      Facet denies the allegations in paragraph 96.

97.      Facet denies all allegations in paragraph 97.

98.      Facet denies all allegations in the first sentence of paragraph 98.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

**COUNT VII:**
**THEFT OF MEDIBIO INTELLECTUAL PROPERTY**
**IN BREACH OF MASTER ALLIANCE AGREEMENT**
**(Against Facet)**

99.      Facet expressly incorporates its answers to paragraphs 1-58 in response to paragraph 99.

100.    Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 100, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

101.    Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 101, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

102.    Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 102, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

103.    Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 103.

104.    Facet lacks sufficient knowledge or information to admit or deny the allegations in paragraph 104.

105.    The allegations in paragraph 105 are legal conclusions requiring no response from Facet.

106.    Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in paragraph 106, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.

107.    Facet denies all allegations in paragraph 107.

108.    Facet denies all allegations in paragraph 108.

109.    The allegations in paragraph 109 are legal conclusions requiring no response from Facet.  To the extent a response is required, Facet denies the allegations in paragraph 109.

110.    Facet admits that Plaintiff has quoted the Master Alliance Agreement accurately in the first sentence of paragraph 110, but Facet objects to the fact that Plaintiff's quote is incomplete and taken out of context, as the contract should be construed in its entirety.  With regard to the "WHEREFORE" sentence, which purports to make demand on Facet for damages and other relief, Facet does not believe any response is required.  To the extent a response is required, Facet denies that Plaintiff is entitled to any relief of any kind.

## IV.    DEMAND FOR TRIAL BY JURY

Plaintiff's demand for a jury trial requires no response from Facet.

### DEFENSES/AFFIRMATIVE DEFENSES

### FIRST DEFENSE/AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

1.    Plaintiff's claims are barred, in whole or in part, because the Amended Complaint fails to state a claim upon which relief can be granted.  At a minimum, Plaintiff fails to state a claim with respect to Counts IV (Accounting/Inspection of Books and Records) and VI (Breach of Project Agreement Quotas) of the Amended Complaint because under the Master Alliance

Agreement, Plaintiff is not entitled to the accounting or inspection of the books and records Plaintiff seeks, and the Project Agreement had no "quotas" or guaranteed minimums, and Plaintiff's exclusive and express remedy was termination of the agreement.

## SECOND DEFENSE/AFFIRMATIVE DEFENSE
### (No Liability/Breach)

2.      Plaintiff's claims are barred, in whole or in part, because Facet has complied with, and performed fully, any and all obligations imposed upon it by law, contract, or equity, and any obligation owed to Plaintiff has been satisfied, waived, released, or otherwise discharged.  Facet did not commit any wrongful acts with respect to Plaintiff and, therefore, is not responsible for any damages.

## THIRD DEFENSE/AFFIRMATIVE DEFENSE
### (Unclean Hands)

3.      Facet is informed and believes, and on that basis alleges, that Plaintiff has or had unclean hands with respect to the matters alleged in the Amended Complaint, and is therefore barred from recovering any relief on the Amended Complaint or any purported claim alleged therein.  Specifically, as further set forth below, Plaintiff committed multiple prior material breaches of the relevant contracts, knowingly or negligently made false representations to Facet, and tortiously interfered with Facet's business relationships.

## FOURTH DEFENSE/AFFIRMATIVE DEFENSE
### (Estoppel)

4.      Facet is informed and believes, and on that basis alleges, that Plaintiff is estopped, by its own actions, conduct, breaches, and misrepresentations, and that of its owners, members, investors, agents, and/or representatives, all as set forth more specifically herein, from asserting any claims against Facet.

## FIFTH DEFENSE/AFFIRMATIVE DEFENSE
### (Fraud in the Inducement/Negligent Misrepresentation)

5.      Facet is informed and believes, and on that basis alleges, that Plaintiff's claims

are barred, in whole or in part, by misrepresentations made by Plaintiff and/or its owners,

members, investors, agents, and representatives, both in the inducement causing Facet to enter

into the relevant contracts, and also through statements after such contracts were entered into.

Specifically, Plaintiff represented that it knew how to properly apply for FDA clearance, that the

FDA approvals for its product were imminent, and that its product would be free from any

potential intellectual property infringement claims, which representations were material, and

each of which were made negligently or with intentional knowledge that such representations

were false.  Additional misrepresentations by Plaintiff included that Facet should not be

concerned over its purchases of lancet automation machines, Calibra automation machines, and

cannula from Tae Chang and/or Kovac-Med because such dealings were outside the scope of the

relevant contracts, and Plaintiff, with knowledge of those business dealings, gave its consent to

such business dealings.  Facet detrimentally relied upon Plaintiff's statements in agreeing to

execute the relevant contracts and in dealing with Tae Chang and/or Kovac-Med.

## SIXTH DEFENSE/AFFIRMATIVE DEFENSE
### (Set-Off/Offset/Recoupment)

6.      Some or all of the purported claims in the Amended Complaint are subject to

setoff, offset, and/or recoupment, including, but not limited to, sums previously paid by Facet

and sums, costs, and expenses incurred by Facet caused by Plaintiff's prior material breaches of

the relevant contracts and misrepresentations as set forth more specifically herein.

## SEVENTH DEFENSE/AFFIRMATIVE DEFENSE
### (Good Faith Action or Omission)

7.      Plaintiff is not entitled to damages because any alleged act or omission by Facet

was in good faith, and Facet had reasonable grounds for believing (including based on Plaintiff's

and its agents' own statements as described above and herein) that its acts or omissions, if any,

were not a violation of any of the relevant contracts or any applicable law, but instead were

authorized and consented to by Plaintiff.

## EIGHTH DEFENSE/AFFIRMATIVE DEFENSE
### (Plaintiff Breached the Project Agreement and Master Alliance Agreement)

8.      Plaintiff is not entitled to damages because of Plaintiff's own prior material

breaches including, but not limited to, breaches of the Project Agreement and Master Alliance

Agreement, before any alleged breach by Facet.  Plaintiff breached these agreements by, among

other things, failing to obtain FDA approval and ensure regulatory compliance of the relevant

product, failing to provide a product free of intellectual property issues and claims of

infringement, and failing to indemnify Facet for its expenses and the delay caused by such

intellectual property issues, all as set forth more specifically herein.

## NINTH DEFENSE/AFFIRMATIVE DEFENSE
### (Impossibility)

9.      Plaintiff's claims are barred, in whole or in part, because the "minimum

quantities" of pen needles set forth in the Project Agreement were not manufactured or supplied

to Facet for it to market, distribute, or sell.  Additionally, in violation of its contractual

obligations and representations, Plaintiff failed to obtain FDA approval for the relevant product

and failed to provide a product free from intellectual property issues, making it impossible for

Facet to market, distribute, and sell such product.  As such, it was impossible for Facet to

purchase the minimum quantities specified in the Project Agreement, all due to Plaintiff's own conduct, breaches, acts, and omissions.

## TENTH DEFENSE/AFFIRMATIVE DEFENSE
### (Failure of Conditions Precedent)

10.     Plaintiff is not entitled to damages because Plaintiff has failed to satisfy all conditions precedent to recovery, either in whole or in part.

## ELEVENTH DEFENSE/AFFIRMATIVE DEFENSE
### (Exclusive Remedy)

11.     Plaintiff's claims are barred, in whole or in part, because Plaintiff's exclusive remedy for Facet not purchasing the minimum quantities set forth in the Project Agreement is termination of the Project Agreement.  Project Agreement § 1.12(a)(ii).

## TWELFTH DEFENSE/AFFIRMATIVE DEFENSE
### (Limitation of Damages)

12.     All of Plaintiff's alleged damages fall under Section 8.02 "Limitations on Liability" of the Master Alliance Agreement.  Thus, any potential award of damages to Plaintiff is limited according to Section 8.02.

## FACET'S COUNTERCLAIMS AND
## THIRD-PARTY CLAIMS AGAINST GLENN PARKER

1.     Plaintiff MediBio has sued Facet for alleged breaches of agreements that Plaintiff and its members and owners have repeatedly violated, breached, sabotaged, and prevented from bearing any fruit.  While Facet would prefer to settle business disputes through negotiation and mutual agreement, its hand has been forced by MediBio's baseless suit.  To recover its losses for a relationship in which MediBio and its Manager, Glenn Parker ("Parker"), have consistently failed to meet every one of their obligations, Facet brings these counterclaims and third-party claims.

## I.   **PARTIES**

2.     Defendant and Third-Party Plaintiff Facet is a Delaware limited liability company with its headquarters in Atlanta, Georgia.

3.     Facet's sole member is Facet Holdings Corp., a Delaware corporation.

4.     Plaintiff MediBio is a Florida limited liability company headquartered in Florida.  Am. Compl. ¶ 1.

5.     Plaintiff MediBio's members are Glenn Parker, Jatinkumar Rajani, and Stephen C. Farrell.  Am. Compl. ¶ 2.

6.     Third-Party Defendant Parker is a Florida citizen domiciled in this District.  Am. Compl. ¶ 3.  Parker is a Member and the Manager of Plaintiff.  Dkt. 38-1 ¶ 2.

7.     Mr. Farrell is a Florida citizen domiciled in this District.  Am. Compl. ¶ 3.

8.     Mr. Rajani is a British citizen and a permanent Florida resident holding a "Green Card," and is domiciled in this District.  Am. Compl. ¶ 4.

## II.   **JURISDICTION AND VENUE**

9.     Having brought this action, Plaintiff is subject to this Court's personal jurisdiction with respect to Facet's counterclaims.  Venue is proper under 28 U.S.C. § 1391(b)(1).

10.     As a resident of Florida domiciled in this District, Parker is subject to this Court's personal jurisdiction with respect to Facet's third-party claims.  Venue is proper under 28 U.S.C. § 1391(b)(1).

11.     This Court has subject matter jurisdiction over Facet's counterclaims and third-party claims under 28 U.S.C. § 1332, as this Court has diversity jurisdiction over the parties because the parties are domiciled in and reside in different states (or countries) and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest, and costs.

### III.   FACTUAL BACKGROUND

12.     Facet entered into three agreements with Plaintiff:  the "Non-Circumvention Agreement," the "Master Alliance Agreement," and "Project Agreement No. 1 (Pen Needles)" (the "Project Agreement") (collectively, the "Agreements").  DKT. 26-4, 26-5, 26-6.

13.     These Agreements were intended to be construed together and to facilitate Facet's selling of mutually-agreed products to its customers.  MediBio repeatedly contracted to, and promised Facet that it would, add value to this relationship in several ways.

14.     For example, under these Agreements, Plaintiff agreed, among other things, to achieve FDA clearance of it products by a certain date, provide Facet with intellectual property free of encumbrances, and indemnify Facet for intellectual property issues.

15.     Yet Plaintiff failed time and time again to meet its obligations under the Agreements and prevented the very purpose of the Agreements:  to make mutually-beneficial business arrangements relating to products and the marketing of those products to Facet's customers.

16.     Instead, Plaintiff and its Manager, Parker, have taken a series of actions in violation of their obligations under the Agreements.

17.     First, Plaintiff failed to meet explicit deadlines for FDA clearance under the Project Agreement, provided Facet with product in violation of third-party patents, and refused to indemnify Facet for its expenses and delays caused by such failures.

18.     Second, Plaintiff and Parker even went so far as to sabotage Facet's relationship with Optum Rx, a potential buyer of pen needles under the parties' Project Agreement, which was going to purchase approximately $9-12 million dollars in pen needles per year from Facet,

by telling Optum Rx not to do business with Facet, dooming Facet's sales to, and business relationship with, Optum Rx.

19.     In addition, in purported furtherance of the Agreements between Facet and MediBio, Parker entered into a Consulting Agreement with Facet in his personal capacity. Pursuant to the Consulting Agreement, Parker took a $60,000 draw from Facet, but failed to provide any promised services in return.

20.     Plaintiff and Parker's actions have caused a host of other issues for Facet including creating a substantial delay in Facet's ability to bring products to market, delay in beginning sales under the Project Agreement, allowing other competitors to enter the market, low sales, and millions of dollars in added costs, lost sales, and associated lost profits.

21.     These failures and breaches by Plaintiff and Parker both prevent Plaintiff's ability to recover on its affirmative claims and entitle Facet to relief.  MediBio and Parker should be ordered to pay for the damages they have caused Facet.

**Plaintiff Fails to Promptly Achieve FDA Clearance Under the Project Agreement**

22.     On June 21, 2013, Facet, Plaintiff, and Tae Chang entered into the Project Agreement No. 1 (Pen Needles), whereby Plaintiff agreed, among other things, to achieve clearance for its products under the FDA by July 31, 2013.

23.     Specifically, Section 1.04 of the Project Agreement states that "[t]he Parties shall use their commercially reasonable efforts for the development, manufacturing and delivery of the products" to achieve clearance by the Food and Drug Administration ("FDA") by July 31, 2013. Dkt. 26-6, at 2.

24.     Plaintiff failed to meet this explicit deadline in the Project Agreement.  Instead, Plaintiff submitted an insufficiently-completed, incoherent (some of which was not even written in English) regulatory document to the FDA, which was woefully inadequate to satisfy Plaintiff's

contractual obligations.  Indeed, the application prepared by Plaintiff was not cleared by the FDA after multiple attempts, and Facet was forced to expend large amounts of money and resources correcting Plaintiff's failures.

25.     Because the product was rejected based on Plaintiff's faulty and deficient regulatory filing, this in turn caused a wide array of issues for Facet including:  delaying sales under the Project Agreement, allowing other competitors to enter the market, low sales, and millions of dollars in additional costs, lost sales, and associated lost profits.

**Plaintiff Fails to Provide Facet with Product Free of Encumbrances**

26.     On June 21, 2013, Facet, Plaintiff, and Tae Chang entered into the "Master Alliance Agreement," in which Plaintiff agreed, among other things, to deliver Facet a product that was free of intellectual property encumbrances.

27.     In the Amended Complaint, Plaintiff claims that it developed trademarks, trade names, trade dress, and logos for Carefine, Quinta Point, and Maxflow and licensed such intellectual property to Facet under the Master Alliance Agreement.  Am. Compl. ¶ 107.

28.     However, the product that Plaintiff claims it "developed" was soon claimed to be in violation of third-party patents.  Specifically, on July 24, 2014, Facet received a letter from Becton Dickinson, a Fortune 500 company and major supplier/competitor in the pen needle market, alleging that Facet's Quinta Point five bevel tip pen needle infringed a Becton Dickinson patent for its Pentapoint five bevel tip pen needle product.[1]  This Quinta Point pen needle was one of the products provided by Plaintiff to Facet.

29.     Because Facet takes allegations of patent infringement seriously, Facet expended large amounts of money and resources, including hiring outside lawyers, to analyze whether the product provided by Plaintiff infringed upon Becton Dickinson's patent.  Facet ultimately had to

---

[1] *See* Becton Dickinson letter to Facet dated July 24, 2014 ("Becton Letter" Ex. 1).

completely redesign the product, at great expense, to avoid infringement of the Becton Dickinson

patent, which further delayed Facet's launch of the pen needle product causing a wide array of

issues for Facet including:  delay of the schedule under Section 1.04 of the Project Agreement,

delay of sales under the Project Agreement, allowing other competitors to enter the market, low

sales, and millions of dollars in costs, lost sales, and associated lost profits.

30.    The Master Alliance Agreement specifically provides that Plaintiff must

indemnify Facet for such intellectual property issues.  Section 8.01(a)(iii) of the Master Alliance

Agreement provides that each party agrees to indemnify every other party from and against "any

third party claim brought or made against any Indemnified Party . . . alleging that the use,

practice or exploitation of any Licensed IP of the Indemnifying Party infringes or constitutes or

results from a misappropriation of any third party Intellectual Property or Technology; provided,

that such use, practice or exploitation is within the scope of the licenses granted by the

Indemnifying Part and its Affiliates to the Indemnified Parties and their respective Affiliates

under this Agreement or the applicable Project Agreement."  Dkt. 26-5, at 24.

31.    Yet, Plaintiff refused to indemnify Facet for any expenses, delay, or damages that

Facet incurred as a result of Plaintiff's intellectual property encumbrances.

### Parker Breaches his Consulting Agreement

32.    On June 1, 2015, Parker, in his individual capacity, entered into a "Consulting

Agreement" with Facet, whereby Parker agreed to "provide advisory and consultative services"

to Facet in order to increase sales.[2]

33.    Specifically, Parker agreed to "diligently and on a timely basis"[3] provide the

following services:  (1) "[a]ssisting in creating a list of potential entities to be agreed upon by

---

[2] Consulting Agreement with Glenn Parker dated June 1, 2015, at 1 ("Consulting Agreement," Ex. 2).
[3] Consulting Agreement at 1 (Ex. 2).

both [Parker] and [Facet]," (2) "[a]ssisting in building a customer base for sales,"

(3) "[p]erforming sales functions for [Facet]" for certain entities identified in Exhibit C, and

(4) "[p]articipating in discussions with Company personnel (telephone conferences, emails,

and/or on-site visits) regarding Company's business."[4]

34.      However, Parker did not provide any of the above services (or any services at all)

under the contract.  Instead, Parker accepted a $60,000 "draw" that was intended to be set off by

commissions and provided no services in return.[5]

35.      Parker's breach of the Consulting Agreement and failure to perform any of the

required sales functions for Facet thereunder prevented Facet from achieving sales levels that it

otherwise should have enjoyed.

36.      Thus, in addition to the $60,000 draw paid to Parker, Facet suffered damages in

the form of delay of sales under the Project Agreement, low sales numbers, lost sales, and lost

profits far in excess of what Parker was paid.

**Plaintiff and Parker Interfere with Facet's Business Relationships**

37.      The business relationship began getting contentious when Plaintiff continued to

fail its obligations.  Additionally, Parker apparently believed he was no longer Facet's ally and

decided to become its enemy.

38.      As part of this plan, Parker decided to destroy Facet's customer relationships.  For

example, Facet had a business relationship with a customer called Optum Rx, a health services

company.  In or around March 2016, Optum Rx expressed its intention to begin buying

approximately $9-12 million dollars in pen needles per year from Facet.  Notably, sales to this

one customer alone would have far exceeded the Project Agreement "minimum quantities."

---

[4] Consulting Agreement at 7-8 (Ex. 2).
[5] Consulting Agreement at 1 (Ex. 2) (This "draw" was intended to be set off my commissions later earned by Parker, but Parker did not earn any commissions because he provided no services.)

Dkt. 26-6, at Schedule 3.  But by this point, Facet and Plaintiff were having issues in their business relationship, caused by, among other things, Plaintiff and Parker's breaches and misrepresentations as described herein.

39.     While Plaintiff and Facet were in negotiations to resolve the differences between them and address the foregoing issues, around June 2016, Parker, as an agent of Plaintiff as well as individually, began using his connections with one of Optum Rx's buyers to block the deal between Facet and Optum Rx.  Parker used this influence over Optum Rx as leverage in his and MediBio's negotiations with Facet.

40.     Because of Parker and Plaintiff's interference and false statements to Optum Rx, Optum Rx subsequently backed out of their purchase arrangement with Facet, and as a result, Facet suffered damages in the form of delay of sales under the Project Agreement, low sales numbers, lost sales, and lost profits.

41.     All conditions precedent to bringing these counterclaims and third-party claims have been met, discharged, or waived.

## COUNT I:
## BREACH OF CONTRACT (OBLIGATION
## TO CLEAR REGULATORY REQUIREMENTS)
### (Against Plaintiff MediBio)

42.     The preceding paragraphs are incorporated herein by reference.

43.     On June 21, 2013, Facet, Plaintiff, and Tae Chang entered into a valid and enforceable "Project Agreement No. 1 (Pen Needles)."

44.     Section 1.04 of the Project Agreement states that "[t]he Parties shall use their commercially reasonable efforts for the development, manufacturing and delivery of the products" to achieve clearance by the FDA by July 31, 2013.  Dkt. 26-6, at 2.

45.     However, in direct contravention of the Project Agreement, Plaintiff did not use commercially reasonable efforts to achieve clearance by the FDA by July 31, 2013.  Instead, Plaintiff submitted an insufficient and flawed regulatory application to the FDA.  Not only was the application deficient and utterly incoherent, some of it was not even in English.  The FDA rejected Plaintiff's application, and Facet was forced to expend large amounts of money and resources correcting and resubmitting it at its own expense.

46.     Because of Plaintiff's breach by not using commercially reasonable efforts to obtain regulatory approval to sell its product, Facet suffered a wide array of damages including: delay with regard to sales under the Project Agreement, allowing other competitors to enter the market, low sales, inability to achieve minimum purchase quantities under the Project Agreement, and millions of dollars in costs, lost sales, and associated lost profits.

### COUNT II:
### BREACH OF CONTRACT (FAILURE TO DELIVER
### PRODUCT FREE OF ENCUMBRANCES)
### (Against Plaintiff MediBio)

47.     The preceding paragraphs are incorporated herein by reference.

48.     On June 21, 2013, Facet, Plaintiff, and Tae Chang entered into a valid and enforceable "Master Alliance Agreement", in which Plaintiff agreed, among other things, to deliver Facet a product that was free of intellectual property encumbrances.

49.     In direct contravention of the Master Alliance Agreement, Plaintiff delivered product in violation of third-party patents.  Specifically, Plaintiff provided Facet with at least one product, the Quinta Point pen needle, that infringed the patent of another company, Becton Dickinson.

50.     Specifically, on July 24, 2014, Facet received a letter from Becton Dickinson that amounted to a "show cause" demand as to why Plaintiff's product did not infringe on Becton

25

Dickinson's patent.[6]  Facet, therefore, was forced to completely redesign the product, at great

expense, to avoid infringement on Becton Dickinson's patent, which further delayed Facet's

launch of the pen needle product, causing a wide array of problems for Facet including:  delay

with regard to sales under the Project Agreement, allowing other competitors to enter the market,

low sales, inability to meet the minimum purchase quantities under the Project Agreement, and

millions of dollars in costs, lost sales, and associated profits.

51.     Further, Plaintiff agreed to indemnify Facet for intellectual property issues under

the terms of the Master Alliance Agreement.  Section 8.01(a)(iii) of the Master Alliance

Agreement provides that each party agrees to indemnify every other party from and against "any

third party claim brought or made against any Indemnified Party . . . alleging that the use,

practice or exploitation of any Licensed IP of the Indemnifying Party infringes or constitutes or

results from a misappropriation of any third party Intellectual Property or Technology; provided,

that such use, practice or exploitation is within the scope of the licenses granted by the

Indemnifying Part and its Affiliates to the Indemnified Parties and their respective Affiliates

under this Agreement or the applicable Project Agreement."  Dkt. 26-5, at 24.

52.     However, Plaintiff failed to indemnify Facet for the above allegation of

infringement as required by the contract, and Facet has suffered damages arising therefrom.

**COUNT III:**
**<u>BREACH OF CONSULTING AGREEMENT</u>**
**(Against Parker)**

53.     The preceding paragraphs are incorporated herein by reference.

---

[6] *See* Becton Letter at 1 (Ex. 1).

54.     On June 1, 2015, Parker, in his individual capacity, entered into a valid and enforceable "Consulting Agreement" with Facet whereby Parker agreed to "provide advisory and consultative services" to Facet.[7]

55.     Specifically, Parker agreed to "diligently and on a timely basis"[8] provide the following services:  (1) "[a]ssisting in creating a list of potential entities to be agreed upon by both [Parker] and [Facet]," (2) "[a]ssisting in building a customer base for sales," (3) "[p]erforming sales functions for [Facet]" for certain entities identified in Exhibit C, and (4) "[p]articipating in discussions with Company personnel (telephone conferences, emails, and/or on-site visits) regarding Company's business."[9]

56.     Parker breached the Consulting Agreement by failing to provide any of the above consulting services to Facet.  Instead, Parker accepted a $60,000 "draw" that was intended to be set off by commissions, and he provided no services in return.[10]

57.     Because of Parker's breach of the Consulting Agreement, Facet suffered damages in the form of the $60,000 draw paid to Parker, delay in sales under the Project Agreement, low sales numbers, inability to achieve the minimum purchase quantities under the Project Agreement, lost sales, and lost profits, for which Plaintiff is now suing Facet.

**COUNT IV:**
**TORTIOUS INTERFERENCE**
**(Against Plaintiff MediBio and Parker)**

58.     The preceding paragraphs are incorporated herein by reference.

---

[7] Consulting Agreement at 1 (Ex. 2).
[8] Consulting Agreement at 1 (Ex. 2).
[9] Consulting Agreement at 7-8 (Ex. 2).
[10] Consulting Agreement at 1 (Ex. 2).

59.     Facet and Optum Rx had a business relationship with each other whereby Optum Rx had agreed to buy approximately $9-12 million dollars in pen needles per year from Facet under the Project Agreement.

60.     Plaintiff and Parker intentionally and unjustifiably interfered with Facet and Optum Rx's relationship when Parker, both in his individual capacity and as Manager of MediBio, used his connections with one of Optum Rx's buyers to block the deal between Facet and Optum Rx.

61.     Specifically, while Plaintiff and Facet were in negotiations to resolve their differences with regard to the regulatory, intellectual property, and other issues described above, Parker exerted his influence over Optum Rx, telling it to not purchase from Facet, so he could gain leverage over Facet on behalf of Plaintiff.

62.     But for Plaintiff and Parker's tortious interference with the business relationship between Facet and Optum Rx, sales to Optum Rx alone would have met the minimum purchase quantities under Schedule 3 of the Project Agreement, for which Plaintiff is now suing Facet.

63.     As a result of Plaintiff and Parker's tortious interference, Facet suffered damages including delay in sales under the Project Agreement, low sales numbers, inability to meet the minimum purchase quantities under the Project Agreement, lost sales, and lost profits, for which Plaintiff is now suing Facet.

**COUNT V:**
**BUSINESS DISPARAGEMENT**
**(Against Plaintiff and Parker)**

64.     The preceding paragraphs are incorporated herein by reference.

65.     As described herein, Plaintiff and Parker made false statements about Facet to Optum Rx without reasonable care as to their truth or falsity.  Parker and Plaintiff intended to and did impugn the honesty and integrity of Facet's leadership and Facet itself.  Such false

statements prejudiced Facet's business, ruined its business relationship with Optum Rx, and prevented Facet from making a large volume of sales under the Project Agreement, far in excess of the minimum quantities, for which Plaintiff is now suing Facet.

66.     As a result of Plaintiff and Parker's false statements, Facet suffered actual damages in the form of delayed sales, low sales numbers, inability to achieve the minimum quantities under the Project Agreement, lost sales, lost profits, and lost customers.

## DEMAND FOR TRIAL BY JURY

Facet demands trial by jury of all issues.

## PRAYER FOR RELIEF

WHEREFORE, Facet prays for relief as follows:

1.     That Plaintiff take nothing by way of the Amended Complaint;

2.     That Plaintiff's Amended Complaint be dismissed with prejudice and that judgment be entered against Plaintiff and in favor of Facet on each and every alleged claim;

3.     That Facet be found to prevail, and judgment be entered in its favor, on each of its counterclaims against Plaintiff and third-party claims against Third-Party Defendant;

4.     For all applicable attorneys' fees, expenses, and costs of suit; and

5.     For such other and further relief as the Court deems just and proper.

Dated:  October 20, 2017                              Respectfully submitted,

                                        By:     /s/ Yvette Ostolaza
                                                Yvette Ostolaza, Esq. (*pro hac vice*)
                                                Vance Beagles, Esq. (*pro hac vice*)
                                                SIDLEY AUSTIN LLP
                                                2021 McKinney Ave., Ste. 2000
                                                Dallas, TX  75201
                                                Telephone:  (214) 981-3300
                                                Facsimile:  (214) 981-3400

                                                -and-

29

Stephen L. Cohen (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W., #600
Washington, DC  20005
Telephone:  (202) 736-8682
Facsimile:  (202) 736-8711

-and-

James D. Gassenheimer
Florida Bar No. 959987
jgassenheimer@bergersingerman.com
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL  33131
Telephone:  (305) 7145-4383
Facsimile:  (305) 714-4340

ATTORNEYS DEFENDANT, FACET
TECHNOLOGIES, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served electronically through the Court's CM/ECF system on this 20th day of October, 2017 upon all parties registered to receive electronic notice in this case as indicated on the attached Electronic Mail Notice.

*/s/ James Gassenheimer*
James Gassenheimer

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey W. Gutchess**
  jeff@axslawgroup.com

- **Daniel Edward Tropin**
  dan@axslawgroup.com

# EXHIBIT  1

**BD Medical – Diabetes Care**
1 Becton Drive
Franklin Lakes, NJ 07417
USA
tel: 201-847-4237
www.bd.com



Helping all people
live healthy lives

7/24/14

Kevin Seifert
CEO
Facet Technologies
112 Town Park Drive,
Suite 300,
Kennesaw, GA 30144

Dear Kevin,

I am sorry we were not able to support your lancet project for Abbott. Please do not hesitate to consider Becton Dickinson in the future if other opportunities arise to work together.

I also want to follow up on our discussions from two weeks ago concerning the Quintapoint™ five bevel tip pen needle and Becton Dickinson's U.S. Patent No. 7,320,683.

As I mentioned, we have seen Facet's Quintapoint™ five bevel tip pen needle illustrated and described on the Facet website. I attach exemplary pages from Facet's website for your reference.

I also attach a copy of Becton Dickinson's U.S. Patent No. 7,320,683. As I had explained, this is the patent with which Becton Dickinson marks its Pentapoint™ five bevel tip pen needle product.

Does Facet have any other drawings or samples of its Quintapoint™ five bevel tip pen needle that it can share with Becton Dickinson to further our evaluation and address our concern? If so, please feel free to forward them to my attention and let me know when to expect them.

Sincerely,

Ernest Elgin
Director, Strategy & Business Development

# EXHIBIT  2

## CONSULTING AGREEMENT

This Agreement is effective June 1, 2015 (hereinafter called the "Effective Date") by and between **Facet Technologies, LLC**, a Georgia limited liability company, having a  principal business address at 3900 North Commerce Drive, Atlanta, GA 30344 ("Company") and **Glenn Parker**, having an address at 2808 North East 25th Street Ft Lauderdale FL, 33305 ("Consultant").

WHEREAS, Consultant has significant background in medical device consulting, including sales; and

WHEREAS, pursuant to an exclusive distribution and supply agreement between Company and Patients Pending Ltd., Company is (a) the exclusive distributor of Timesulin®, a replacement cap for insulin pens with a timer function, and (b) distributor of Alcohol Swabs, individually wrapped in boxes   ("Swabs"), and (c) such other products launched in the future by the Facet Insulin Delivery business unit ("Future Products") (Timesulin®, Swabs, and Future Products are hereinafter collectively referred to as the "Products"); and

WHEREAS, for business reasons, Company would like to have Consultant provide advisory and consultative services to Company, including but not limited to the services set forth on Schedule A attached hereto (the "Services"); and

WHEREAS, Consultant represents that Consultant has the expertise and is willing to conduct such activities for Company; and

WHEREAS, the parties wish to define the rights and obligations of the parties including rights to the use and protection of information disclosed to, or developed by, Consultant pursuant to such activities; and

WHEREAS, the parties also wish to define the ownership of, and use rights in, certain intellectual property rights resulting from such activities by Consultant.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties agree as follows:

1.      Company hereby appoints Consultant on a non-exclusive basis, and Consultant hereby accepts such appointment, to provide the Services on behalf of Company during the term of this Agreement solely to entities  listed on Schedule C attached hereto.  Consultant shall diligently and on a timely basis provide the Services.  The Services shall be subject to change from time to time as Consultant and Company may agree in writing.

2.      The consideration to be paid by Company hereunder, inclusive of any applicable sales or service tax, for all Services of Consultant hereunder shall be as follows:

a.      Draw Against Commissions. Company will pay Consultant the amount of ten thousand dollars ($10,000 US) per month for six (6) months, for a total amount not to exceed sixty thousand dollars ($60,000 US) (the "Draw, Commencing June 2015").  The Draw shall then be set

1

off immediately by any Commission (via the formula as defined below on Schedule B) earned by Consultant, and Company will have no obligation to pay Consultant any earned Commission, until the entire Draw has been reimbursed to Company. Upon completion of reimbursement of the draw to the Company, Consultant shall continue to be eligible to earn Commissions for the duration of this agreement. After 6 months mentioned above and after the draw has been depleted, Company will pay Consultant in 15 days from the end of the month the commission based on the formula on Schedule B for the previous month and wire commission into the account below. Company will provide June and July's payment within one business day upon signing of this agreement by wire to GMSR Investments LLC Bank of America, account number 898061676627, routing number 026009593.

b. Commission. The commission as set forth on Schedule B attached hereto ("Commission"), provided such Services are approved in advanced and in writing by Company. A Commission will be paid , subject to the reimbursement of the Draw as aforesaid, based on sales only to the entities listed on Schedule C .

It is expressly understood and agreed to by the parties that the foregoing consideration is the entire compensation for all of Consultant's obligations and Services rendered by Consultant hereunder, and that under no circumstances shall any additional fees or other consideration be due to Consultant. \

Notwithstanding the foregoing paragraph, payments under this agreement do not effect the payments under any agreement between MediBio and Facet Technologies LLC..

3.     Company shall reimburse Consultant for reasonable and customary out-of-pocket expenses, including but not limited to, travel, lodging, and meal expenses, incurred by Consultant in the performance of Services hereunder, provided such expenses are approved in advance and in writing by Company and provided Consultant supplies Company with receipts or other reasonable documentary evidence of such expenses.

4.     Company may disclose to Consultant confidential and proprietary information and material solely for the purpose of enabling Consultant to provide Services. Consultant agrees to accept the disclosures of Company on a confidential basis ("Confidential Information"); not to disclose Confidential Information to any third parties; and to exercise at least the same degree of care with respect to the Confidential Information as Consultant exercises in preserving and safeguarding Consultant's own confidential and proprietary information. Confidential Information may include but is not limited to information relating to Company's businesses and affairs, finances, sales, products, processes, strategies, services, markets, software, techniques, trade secrets, research, development, prototypes, designs, drawings, engineering, clinical data, inventions, testing procedures, operations, plants and facilities, finances, and/or marketing. Confidential Information may be disclosed in any format including but not limited to documents, electronic/computer files, audio files, video files, software, prototypes, samples, materials and equipment. Consultant agrees that any Confidential Information disclosed to Consultant or obtained by Consultant from Company will not be disclosed by Consultant to any other person or used by Consultant for Consultant's own benefit or gain in any other manner except in connection with authorized Company business. Consultant further agrees to use any Confidential Information only for the

2

purpose of conducting business in a manner consistent with this Agreement or as approved in writing by Company.  The obligations of non-use shall cover, but not be limited to, the following acts: (a) filing by Consultant of patent applications based on Confidential Information and/or based on Consultant's use of Confidential Information; and (b) commercial or other use of results/inventions, unrelated to the Services, based on Consultant's use of Confidential Information.  Consultant agrees that a breach of the provisions herein relating to Confidential Information would result in irreparable harm to Company for which money damages are inadequate. Consequently, in the event of a breach or threatened breach by Consultant of provisions herein relating to Confidential Information, Company shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.  It is further agreed by the parties that the existence, the terms and the conditions of this Agreement shall be deemed to be Confidential Information of Company, and shall be safeguarded accordingly and not disclosed to others.

5.     Notwithstanding the foregoing, Consultant's obligations under Section 3 above shall not extend to any disclosed information:

    (a)     that was publicly available prior to the date of disclosure by Company; or

    (b)     that has been received by Consultant from another source not under obligation of secrecy to Company; or

    (c)     that becomes publicly available not due to any unauthorized act by Consultant; or

    (d)     that Consultant is required to disclose under applicable laws and regulations or a court or other governmental order, provided that (i) except where impracticable, Consultant provides Company with reasonable advance notice of such disclosure requirement and affords Company opportunity to oppose or limit, or secure confidential treatment for, such required disclosure, and (ii) Consultant discloses only that portion of the Confidential Information that Consultant is legally required to disclose.

For the purposes of the provisions of this Section, Confidential Information shall not be deemed to be available to the public or known to Consultant merely because it may be embraced by a more general disclosure or derived from combinations of disclosures generally available to the public or known to Consultant.

6.     Consultant acknowledges that Company is not obligated to supply any Confidential Information to Consultant under this Agreement.

7.     Upon request from Company, Consultant agrees to return to Company all Confidential Information provided by or belonging to Company, and any other materials incorporating any Confidential Information and all copies thereof.

8.     Consultant hereby agrees that Consultant will not disclose to Company any information that is Consultant's or a third party's confidential information or any information which Consultant

3

6/4/15

is otherwise under a duty to maintain in confidence. As a result, knowledge and information of any kind disclosed by Consultant to Company under this Agreement shall be deemed to have been disclosed without obligation on the part of Company to hold same in confidence, and Company shall have the full right to use and disclose such knowledge and information without compensation to Consultant beyond that specifically provided in this Agreement.

9.      Consultant hereby agrees that no right or license under any patent, copyright, trademark or other intellectual property of Company, either current or future, or whether or not arising out of the Services under this Agreement, is granted, or is to be construed as being granted, to Consultant by the terms and conditions of this Agreement.

10.     During the performance of the Services hereunder, Consultant may produce, compile, develop, generate or create results ("Consultant Results"). Consultant Results may include but are not limited to: documented and undocumented data such as literary works, compilations, reports, presentations, texts, collective works, audiovisual works, telephonic recordings, designs, drawings, abstracts or other written material, manufacturing, assembly and user maintenance information, specifications, methods, practices, protocols, electronic/computer files and computer software, prototypes, products, samples, materials, equipment, business strategies, sales and marketing strategies, advertising strategies, and clinical strategies.

11.     Consultant agrees to transfer and assign, and hereby transfers and assigns, to Company and its designees, without further compensation, the entire right, title and interest throughout the world in and to: (a) all Consultant Results; and (b) all intellectual property of any kind resulting from Consultant's Services under this Agreement including but not limited to all patent and patent applications, copyrights, trade secrets, trademarks and mask works (collectively, "Intellectual Property"). All such Consultant Results and Intellectual Property will be considered work(s) made by Consultant for hire for Company and will belong exclusively to Company. If by operation of law any of Consultant Results or Intellectual Property resulting from Consultant's Services under this Agreement, is not owned in its entirety by Company automatically upon creation, then Consultant agrees to transfer and assign, and hereby transfers and assigns, same as stated in the first sentence of this Section 11. Consultant further agrees to promptly disclose to and assist Company in every proper way to obtain for Company's benefit, and at Company's expense, appropriate legal protection for Consultant Results and Intellectual Property transferred and assigned, and to be transferred and assigned, hereunder to Company. For clarity, all Consultant Results and Intellectual Property shall be considered and treated as Company Confidential Information upon its creation and will be subject to protection under this Agreement. Notwithstanding the above, company recognizes Consultant is a shareholder of Medibio which may allow him access to confidential information from other sources not related to his role as Consultant for Facet, and therefore agrees to above only if he invents the above information through his role as a Consultant of Facet Technologies.

12.     Consultant agrees that during the term of the Agreement, Consultant will not enter into a confidentiality agreement, non-disclosure agreement, consulting agreement, development arrangement, or the like with any company or any other person or entity whose research and development or business relates in any way, directly or indirectly, to any activity or Services that

4

Consultant may be engaged in on Company's behalf or that conflict or may conflict with the best interests of Company.

13.     Excepting only formal written agreements executed hereafter or concurrently herewith, this Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and merges or supersedes all prior discussions, proposals, offers, and agreements, if any, with respect thereto, and there are no understandings, representations or warranties of any kind except as set forth herein.  Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision.

14.     This Agreement may not be amended, nor any obligation waived, except in writing signed by authorized representatives of all of the parties hereto.  In the event that any provision of this Agreement is determined to be invalid, illegal or unenforceable by a court, the remainder of the Agreement shall remain in full force and effect.

15.     In the performance of all Services hereunder, Consultant shall be deemed to be and shall act as an independent contractor and shall retain sole and absolute discretion, control and judgment of the manner and means of carrying out the Services rendered hereunder.  Consultant expressly acknowledges and agrees that Company will not pay or withhold from the compensation paid to Consultant pursuant to this Agreement any sums customarily paid or withheld on behalf of Company employees including, without limitation, income tax, social security tax, worker's compensation insurance, other statutory fees and expenses, and/or fringe benefits, including health insurance benefits, paid vacation, or any other benefit.  Consultant further agrees that this Agreement shall not be construed as a Teaming, Joint Venture, or other such arrangement, and Consultant is not authorized or empowered to act as an agent for Company for any purpose.

16. a.   Consultant shall defend, indemnify and hold harmless Company and its respective officers, agents and employees from and against any lawsuits, liabilities, damages, expenses and costs (including reasonable attorneys' fees) (collectively, "Liabilities") as a result of any third party legal claims or actions arising out of: (a) Consultant's breach of any of its covenants, representations or warranties under this Agreement; or  (b) Consultant's negligence or misconduct, provided such Liabilities do not arise from the gross negligence or willful misconduct of Company.
b.     Company shall defend, indemnify and hold harmless Consultant from and against any Liabilities as a result of any third party legal claims or actions arising out of: (a) Company's breach of any of its covenants, representations or warranties under this Agreement; or (b) Company's negligence or misconduct, provided such Liabilities do not arise from the gross negligence or willful misconduct of Consultant.

17.     Consultant hereby represents that Consultant has full right, power and authority to enter into and be bound by all of the terms and conditions of this Agreement, and to transfer all of its rights and to carry out all of Consultant's obligations under this Agreement, without the approval or consent of any other person or entity.  Consultant also represents and warrants that Consultant is not prohibited, restricted or otherwise limited by any contract, agreement or understanding entered into by Consultant, or by which Consultant is bound, with any other person or entity, from entering into this Agreement.

5

8/4/15

18.    Consultant hereby agrees to be solely responsible for securing and/or procuring from any required entity, including but not limited to third parties, employers, institutions, or governmental or regulatory agency, any permissions, reviews, approvals, authority, releases, consents, and the like that are legally required or otherwise necessary to perform the Services.

19.    The parties agree to comply with all applicable federal, state and local laws, regulations, ordinances, government agency interpretation of laws or regulations and orders, including but not limited to, the Foreign Corrupt Practices Act, the AdvaMed Code of Ethics on Interactions with Health Care Professionals, and the EucoMed Guidelines on Interactions with Health Care Professionals (collectively, "Laws and Regulations") with respect to the performance of all provisions of this Agreement. The parties believe in good faith that this Agreement complies with these Laws and Regulations. In the event there shall be a change to any Laws and Regulations or the interpretation of any of the foregoing, or the adoption of new Laws and Regulations, any of which are reasonably likely to materially and adversely affect the manner in which either party may perform or be compensated for its Services under this Agreement, or which shall make this Agreement unlawful, the parties shall immediately enter into good faith negotiations regarding a new service arrangement or basis for compensation for the rights assigned and Services furnished pursuant to this Agreement that complies with the Laws and Regulations that approximates as closely as possible the economic position of the parties prior to the change. In the event that Company reasonably determines that this Agreement may not be modified to comply with the foregoing change to the Laws and Regulations, Company may terminate this Agreement.

20.    Consultant acknowledges that, pursuant to federal laws and regulations, Company may be required to disclose to certain federal agencies payments made or other remuneration provided to Consultant pursuant to this Agreement. Consultant consents to Company's disclosure of such information. Consultant further acknowledges that such federal agencies may publish the foregoing information, or otherwise make such information available to the public.

21.    This Agreement shall become a part of any Purchase Order or other written agreement between the parties relating to any Services which are the subject matter of this Agreement. In the event of any conflict between the terms of this Agreement and any document of which it may become a part, the terms of this Agreement shall take precedence.

22.    This Agreement shall inure to the benefit of and is binding on the parties hereto and their respective legal successors. Consultant may not assign this Agreement, except Consultant may assign this agreement to MediBio.

23.    This Agreement shall be interpreted and construed, and the legal relations created herein shall be determined, in accordance with the laws of the State of Georgia, U.S.A., without regard to its conflict of law provisions. The parties agree that the venue for any legal proceeding regarding enforcement of any of the provisions of this Agreement shall be the courts of the State of Georgia, U.S.A.

24.    The term of this Agreement shall commence on the Effective Date unless terminated sooner in accordance with this Agreement. This Agreement may be terminated at any time upon 6 months' notice for any reason upon written notice of termination given by either Company or Consultant

6

to the other party hereto. Commissions will continue after termination for as long as the Health Plans on Schedule C continues to purchase the Products from Company. All of the representations, warranties, and indemnifications made in this Agreement, and all terms and provisions hereof, including the rights and obligations contained herein with respect to Confidential Information, Intellectual Property and Consultant Results, intended to be observed and performed by the parties after the termination or expiration hereof, shall survive such termination or expiration and continue thereafter in full force and effect, subject to the applicable statutes of limitations.

25.     This Agreement may be executed in separate original, facsimile, or .pdf counterparts, each of which shall be deemed an original, and all of which shall be deemed one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement.

**GLENN PARKER**

By: _____

Name: _____

Title: _____

Date: _____

**FACET TECHNOLOGIES, LLC**

By: _____

Name: Alan Panzer

Title: CEO

Date: _____

## SCHEDULE A

### SERVICES / SCOPE OF WORK

The work to be performed by Consultant under this Agreement involves providing consulting and advisory services to Company relating to Company's business programs involving the Products, and may include, but not be limited to, the following:

- Assisting in creating a list of potential entities to be agreed upon by both Consultant and Company;
- Assisting in building a customer base for sales of the Products; and

7

- Performing sales functions for Company strictly limited to the entities set forth on <u>Schedule C</u> attached hereto, or as updated monthly by the parties
- Participating in discussions with Company personnel (telephone conferences, emails, and/or on-site visits) regarding Company's business.

## **SCHEDULE B**

### **PRODUCTS/COMMISSION**

**Products:**     Timesulin®
Alcohol Swabs
Future Products

**Commission:** Timesulin®     Ten percent (10%) of Facet net sales (price negotiated with
the Health Plan) of Timesulin® to entities listed on
Schedule C

8

Alcohol Swabs          Ten percent (10%) of Facet net sales (price negotiated with
                       the Health Plan) of Alcohol Swabs to entities listed on
                       Schedule C

Future Products        Ten percent (10%) of Facet net sales (price negotiated with
                       the Health Plan) of Future Products to entities listed on
                       Schedule C

## SCHEDULE C

## ENTITIES

Subject to the provisions of Section 2 of this Agreement, the following is a list of entities for
which Company will be paying a Commission to Consultant hereunder.  This Schedule C
must be approved in writing by Company's Management and will be updated monthly to
include new entities. If Consultant is not able to secure a contract within one year of the date
it was added to this list, Company may remove a Health Plan from the list or extend it for an
additional agreed upon time to allow the consultant to secure an agreement.

The following List was added June 1, 2015

United Healthcare
ProCare (PBM)
Prime Therapeutics

9

Humana
Independent Blue Cross Blue Shield (Philadelphia)
Aetna
AmeriHealth